# UNITED STATES DISTRICT COURT

NORTHERN **FILED** DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MAY 1 0 2005

**MAGISTRATE JUDGE LEVIN**

JOSE ALFREDO AMARAL ESTRADA
CUTBERTO SOLANO CABRERA
EVERARDO LIRA-ESQUIVEL
MARIA LETICIA BERDEJA-SANCHEZ

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

**CRIMINAL COMPLAINT**

CASE NUMBER:

# 05 CR 421

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief.  Between on or about an unknown date and continuing to on or about <u>May 9, 2005,</u> in

<u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendant(s) did

```
conspire with each other to knowingly and intentionally possess with intent to distribute
a controlled substance, namely, at least 5 kilograms of a mixture or substance containing
a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in
violation of 21 U.S.C. § 841(a)(1);
```

in violation of Title 21 United States Code, Section(s) <u>846</u>.

I further state that I am a <u>Special Agent of the Drug Enforcement Administration</u> and that this complaint is
based on the following facts:

**See attached affidavit.**

Continued on the attached sheet and made a part hereof:    X Yes _____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>May 10, 2005</u>_____    at    <u>Chicago, Illinois</u>_____
Date                                              City and State

_____
Signature of Judicial Officer

_____
IAN H. LEVIN, U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

STATE OF ILLINOIS        )
                         )        SS
COUNTY OF COOK           )

## AFFIDAVIT

I, Chris O'Reilly, Special Agent, U.S. Drug Enforcement Administration, being duly sworn under oath states as follows:

1. I am currently assigned as a Special Agent with the United States Drug Enforcement Administration ("DEA"), Chicago Field Division, and have been so assigned for approximately 3 years. Prior to my assignment at the Chicago Field Division, I was in the St. Louis, Missouri, Field Division for approximately 3 years. Prior to that, I was in the New York, New York, Field Division for approximately 3 years. And, prior to that I was an investigator for the Cook County State's Attorney's offices where I was detailed to a DEA Task Force. My official DEA duties include investigating criminal violations of the federal controlled substances laws, such as Title 21, United States Code, Sections 841(a)(1), 843, 846 and 848. I have received special training in controlled substances enforcement under Title 21 of the United States Code. I also have been involved in investigations involving various types of visual surveillance and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from drug trafficking. I am familiar with the ways in which controlled substances traffickers conduct their business, including, but not limited to, their methods of storing and distributing narcotics.

1

6. I witnessed the Chrysler exit the alley and turn North onto Lockwood, and also thought the driver looked like Sosa-Verdeja from the picture of him taken at his 1999 arrest and that I had placed in my visor in my car. I followed the Chrysler in my own vehicle. The Chrysler turned West on Drummond and then pulled over. I stopped my vehicle about 30 yards behind the Chrysler.

7. Both Alfredo and Beto exited the vehicle, looked around in all directions, and started walking further west on Drummond. Other agents maintained surveillance from their own vehicles of the two individuals as they walked. They walked effectively in a circle by making a series of right turns, and the surveillance noted that they continued actively to look around suspiciously.

8. As Alfredo and Beto turned south on Long and toward 5352 West Deming, other agents and I approached the two individuals so as to interview them before they reached that location. The other agents and I were wearing bulletproof vests bearing the word "Police" on the front and rear.

9. I asked Alfredo and Beto to step toward my vehicle and asked whether they had any identification. Beto was visibly nervous, and I feared that he intended to flee. I conducted a pat down search of both individuals. I found keys, including a key with a Chrysler logo, a cell phone, and a wallet on Alfredo, who had been driving the Chrysler and whom I thought looked like Sosa-Verdeja. The wallet contained a Mexican driver's license and a Mexican Voter's Registration Card identifying Alfredo as Jose Alfredo Amaral Estrada. I found a cell phone and a wallet on Beto, whose wallet contained a Mexican driver's license and a Mexican Voter's Registration Card identifying Beto as Cutberto Cabrera Solano.

10. I called a Spanish-speaking agent on my DEA cell phone and he started asking questions in Spanish on the cell phone's speakerphone to Alfredo with whom I was standing. Beto was standing with another DEA agent.

11. In response to questions in Spanish, Alfredo stated that he had come from Bensenville, that he had met with a friend, and that he did not have a car with him. He did not answer a follow-up question as to how he got to the area from Bensenville. Alfredo denied that they keys I had found in his pocket were his, and also denied having been in a Chrysler 300M.

12. Because he had had been present in the alley behind 5352 West Deming where agents had determined Sosa-Verdeja may have been located or residing, because he had plainly lied about his whereabouts, and because he had acted so suspiciously when I saw him abandon the Chrysler 300M and walk effectively in a circle while looking to see if he was being observed, I detained Alfredo and drove him in my car to the Chrysler he had left behind. When we arrived at the Chrysler, I had my Spanish-speaking colleague ask Alfredo whether he had been in the Chrysler 300M that we had pulled alongside. Alfredo said he had never seen the car before.

13. Realizing that I had the keys that Alfredo had denied were his, I pushed the door open portion of the key fob when I was near the Chrysler and I heard the locking mechanisms on the Chrysler activate.

14. I later approached the vehicle and looked inside. I saw a very large black duffle bag on the back seat.

4

15. I had a Spanish-speaking colleague ask Alfredo if the Chrysler or anything inside it was his. He continued to deny any knowledge of the car and stated that he was out for a walk.

17. I opened the car door and the duffle bag that was on the back seat. The duffle bag was filled with a very large amount of U.S. Currency -- $100s, $20s, and $10s. The total approximates $250,000.

18. I returned to 5352 West Deming, together with some of the other DEA agents who had maintained surveillance. Alfredo and Beto were detained by other agents away from 5352 West Deming. My Spanish-speaking colleague asked Beto whether he had been in the Chrysler 300M or whether it was his. Beto stated that he was picked up by Alfredo, that they went for a drive, and that Alfredo said let's get out and go for a walk.

19. The building at 5352 West Deming is a three-flat, with one level being the basement. The front door was ajar. We knocked on the first floor apartment and did not receive an answer. We knocked on a door that looked to provide an entrance to the basement and did not receive an answer. We went upstairs and knocked on the door to the second floor apartment. After about a minute and several knocks, a woman later identified as Maria Leticia Berdeja-Sanchez opened the door.

20. We asked Berdeja-Sanchez if anyone else was in the apartment, to which she replied "no." We showed her a picture of Sosa-Verdeja, whom she said she did not recognize. Through the opening of the door she had opened, I saw the arm of another individual on a couch. After seeing the other person, I pushed the door further open and asked the individual on the couch, a

man later identified as Everardo Lira-Esquivel for some identification. He got up from the couch and he started walking toward me. I walked toward him, entering the apartment and looked around to see if anyone else was in the apartment.

21. At or about this time, another agent dialed the telephone number of a cellular phone believed to be associated with Sosa-Verdeja. A cell phone rang in the apartment as the agent told me that he had dialed the number. The woman who had met us at the door, Berdeja-Sanchez, quickly grabbed the ringing cell phone from a table in the living room.

22. Concerned about our safety, we asked Berdeja-Sanchez and Lira-Esquivel whether anyone else was in the apartment and another agent checked the area where Lira-Esquivel had been seated, which was only a couple feet behind where he was standing. The agent discovered a loaded 9MM handgun where Lira-Esquivel had been sitting.

23. I directed that other agents detain Lira-Esquivel and Berdeja-Sanchez. And, I walked through the apartment to ensure that no one else, including Sosa-Verdeja, was present there.

24. At about this time, a Spanish-speaking colleague arrived and Mirandized both Lira-Esquivel and Berdeja-Sanchez. Both acknowledged orally and in writing that they had received and understood their rights. Both also provided written consents to search the premises.

25. My Spanish-speaking colleague interviewed Lira-Esquivel who stated that the apartment belonged to Alfredo and that Alfredo allowed Lira-Esquivel and his wife Berdeja-Sanchez to live there for free in exchange for work in connection with the sale and distribution of cocaine. In particular, Lira-Esquivel stated that Alfredo and Beto stored large amounts of cocaine

6

in the apartment and that it was Lira-Esquivel's job to keep the apartment safe and to safeguard what they stored in it. Lira-Esquivel also stated that Alfredo and Beto relied on Lira-Esquivel to maintain records of their cocaine business, including quantities and charges, and Lira-Esquivel stated that he maintained those records. Lira-Esquivel also stated that he helped Alfredo and Beto count and organize large amounts of currency, which he estimated to be in excess of $300,000 on at least one occasion.

26. When asked if there was any cocaine in the apartment at that time, Lira-Esquivel said there was and led the agents to the kitchen where Lira-Esquivel pointed to a concealed compartment above the kitchen cabinets. Agents located 12 packages of approximately kilogram-sized bricks of a white powdery substance that Lira-Esquivel stated was cocaine. Field tests on a sample package tested positive for the presence of cocaine.

27. The concealed compartment had space for a total of approximately 50 kilogram-sized bricks. Lira-Esquivel stated that he had stored 40 kilograms of cocaine brought to the apartment by Alfredo two moths earlier.

28. When asked if there was any drug-related paraphernalia in the apartment at that time, Lira-Esquivel said there was and led the agents to several shoeboxes visible under a weight bench in the dining room. In those shoe boxes, agents found a scale, approximately one ounce of cocaine, two bundles of U.S. currency, and a variety of packing materials. On top of the shoe boxes was a roll of duct tape.

7

29. Agents also found two spiral notebooks on a built-in bookshelf in the living room. Lira-Esquivel explained that these were the records he maintained of the drug business being conducted by Alfredo and Beto. Agents also found two additional notebooks in a pantry of the kitchen, which Lira-Esquivel also stated were the records he maintained of the drug business.

30. I had already taken pictures of Alfredo and Beto after they had been detained, and we asked Lira-Esquivel whether he recognized either of the two. He identified the picture of Jose Alfredo Amaral Estrada as "Alfredo" and the picture of Cutberto Solano Cabrera as "Beto."

31. My Spanish-speaking colleague also interviewed Berdeja-Sanchez. She stated that she knew that the apartment belonged to Alfredo and that Alfredo allowed her family to stay there for free. She relayed that her husband stated that Alfredo allowed them to live there for free because Lira-Esquivel was holding something in the apartment for Alfredo that was illegal. She also stated that Everado was also paid money in addition to the free rent for the work he did for Alfredo.

32. Berdeja-Sanchez was also shown pictures taken earlier of Alfredo and Cutberto. She identified Alfredo as Alfredo and the picture of Cutberto as "Beto." Berdeja-Sanchez also stated that she had seen Beto with Alfredo three or four times at the house over the previous days.

33. Berdeja-Sanchez also reported that, on several occasions when Alfredo and Beto came to the apartment, Lira-Esquivel directed her to go to another room or to leave. She also said that she would take her two children out of the room or to leave when Alfredo and Beto arrived.

8

34. We also searched the detached garage. It contained a small trailer holding several plastic garbage bags. The bags contained used clear plastic bags that had the distinct and powerful odor of cocaine. Also in the garage was a child's bicycle.

35. After the search of the garage, agents reported to me that they had recovered a key chain from Beto. I instructed the agent to see if any of the keys worked in the second floor apartment. The agent reported back to me that a key opened the locking mechanism on the apartment's door.

FURTHER AFFIANT SAYETH NOT

Chris O'Reilly, Special Agent
U.S. Drug Enforcement Administration

Sworn to before me on
this 10st day of May, 2005

United States Magistrate Judge
Northern District of Illinois

9